10/20/05 13:37 FAX 770 649 0400 Ø002
10/20/2005 08:51 FAX 2052518920 LYE NO.629 P.4
OCT.10.2005 10:45AM FFM&S ATTYS DOTHAN AL

OCT - 7 2005

IN THE CIRCUIT COURT OF BARBOUR COUNTY, ALABAMA
EUFAULA DIVISION

| | | |
|---|---|---|
| HARRIS LEVESON, an individual; HARRIS PEST & TERMITE CONTROL, et al, | § | |
| Plaintiffs, | § | |
| vs. | § | CASE NO.: CV-04-67 |
| PEOPLES COMMUNITY BANK, a corporation; LARRY PITCHFORD, an individual; JERRY GULLEDGE, an individual, | § | |
| Defendants. | § | |

**ORDER**

This matter was called for a jury trial before the Court on August 22, 2005. On motion of the Defendants, the jury demand was withdrawn and the case proceeded to a nonjury trial. Over a three-day period, the Court received testimony of witnesses and documents into evidence in the course of an *ore tenus* hearing. The parties also had an opportunity to submit post-trial briefs. In accordance with Ala. R. Civ. P. 52, the Court makes the following findings of fact and conclusions of law:

**Procedural Background**

The Plaintiffs are Harris Leveson and Harris Pest & Termite Control. Plaintiffs' complaint asserted several claims against Defendants Peoples Community Bank (hereinafter "the Bank"), Larry Pitchford and Jerry Gulledge. These claims are negligence, wantonness, fraud, suppression, deceit, breach of contract, breach of fiduciary duties, conversion, negligent and/or wanton hiring, retention and supervision, outrage and violation of duties as a notary public. Plaintiffs seek compensatory damages and punitive damages.

Defendants denied Plaintiffs' allegations. Defendants contended that the Plaintiffs have not been damaged by their alleged wrongful conduct. Defendants contended that Plaintiffs have conjured up damages which were proved primarily by self-serving testimony. Defendants further contended that Plaintiffs did not present sufficient evidence to support an award of punitive damages.

EXHIBIT
tabbies
B

The Court heard testimony from nine witnesses. Plaintiffs called as witnesses Christine Jernigan, Leteshia Jackson, Joe Puccio, Cara Hutto, Ray Weeks and Tamara Grubbs Newton. Defendants called Larry Pitchford and Harris Leveson as witnesses. Plaintiffs then called Jerry Gulledge as a rebuttal witness.

Plaintiffs also offered into evidence the depositions of Lisa Bell, Merri Brogden, Sharon Giddens, Defendant Jerry Gulledge, Macy Holley, Christine Jernigan, Plaintiff Harris Leveson, Michelle Patterson, Defendant Larry Pitchford, Kevin Potthoff, Sandy Stewart, Rickey Stuckey and Ricky Thursby.

The Court considered more than 150 exhibits introduced into evidence by the parties in support of their positions. The Court also received into evidence audiotapes of conversations and written transcripts from those tapes of conversations involving Potthoff, Leveson, Jernigan, Gulledge and Pitchford.

Findings of Fact

The findings of fact set forth below are based on the entire record, including the observations by the Court of the demeanor of the witnesses, briefs, exhibits, depositions and other relevant evidence adduced at the trial.

Harris Leveson is the sole owner of Harris Pest & Termite Control, whose office is located on Broad Street in Eufaula.

Christine Jernigan is a bookkeeper who works part-time for Harris Pest & Termite Control. Jernigan was authorized by Harris Leveson to handle his finances.

Peoples Community Bank has branches in Alabama, Florida and Georgia. The Bank has six branches in the State of Alabama, one of which is in Eufaula.

Rickey Stuckey is the Bank's Chief Executive Officer. His office is in Colquitt, Georgia.

Defendant Larry Pitchford is the Bank's President for the State of Alabama. He supervises the branch managers of all six branches in the state. He is also on the Bank's loan committee.

In late 2002, Larry Pitchford met with Joe Puccio, who had worked with Kevin Potthoff at Barbour County Bank. Pitchford expressed an interest in hiring Kevin Potthoff. Puccio told Larry Pitchford that if Potthoff was going to work in a lending capacity that he

would have to be closely supervised. Pitchford and Rickey Stuckey hired Kevin Potthoff to be the Bank's manager of the branch in Eufaula on October 29, 2002. As branch manager, Potthoff was actively involved in lending. Potthoff was an "at will" employee of the Bank. The Bank has a probationary period for six months after hire. Potthoff was the Bank's manager until he was terminated on November 3, 2003.

Defendant Jerry Gulledge was hired by the Bank's President Larry Pitchford in June 2003. Gulledge had no previous banking experience. Kevin Potthoff was Gulledge's supervisor. After Potthoff was terminated, Gulledge was promoted to branch manager. Gulledge left the Bank in August 2004.

Sharon Giddens was a consumer lender in the Eufaula branch for the Bank. She was supervised by Kevin Potthoff and then by Jerry Gulledge.

Lisa Bell was employed by the Bank in Eufaula. She also was a notary public. Bell became a notary in the Summer of 2003. She was supervised by Kevin Potthoff and then by Jerry Gulledge.

Harris Leveson had banked with Kevin Potthoff at Barbour County Bank, which later became MidSouth Bank. After Potthoff became employed by the Bank, he tried to convince Leveson to move his loan and accounts there. Leveson opened a business checking account and established a line of credit at the Bank in December 2002.

Potthoff was discovered check kiting on November 22, 2002, one month after he was hired as branch manager. Even though the Bank's Personnel Policy allowed it to summarily dismiss Potthoff for check kiting, the Bank chose to give him a chance.

One month later, in December 2002, Potthoff began writing cashier's checks to his wife in order to quickly obtain funds. This was in violation of the Bank's policies and procedures. However, the Bank continued to employ Potthoff even after notice that he was writing cashier's checks to his wife and delaying the payment on those cashier's checks.

In January 2003, a loan processor at the Bank reported that Potthoff was issuing loans which had terms different from the terms approved by the Bank's loan committee. This was in violation of the Bank's policies and procedures. However, the Bank continued to employ Potthoff even after notice of these problems.

In January 2003, Harris Leveson obtained a $41,000 line of credit from the Bank to take care of cash flow issues in his business. Plaintiffs had an understanding with Potthoff

that Leveson or Jernigan would notify him whenever they needed money moved from the line of credit into the company's checking account.

The Bank had a policy which permitted the waiver of non-sufficient fund ("NSF") fees for overdrawn customers. In February 2003, Potthoff paid NSF fees of a customer by depositing bank funds into that customer's account.

In April 2003, Potthoff issued more cashier's checks in his wife's name and wrote an unsecured loan allegedly for his housekeeper in violation of the Bank's policies and procedures.

By May 2003, Potthoff had been overdrawn on his personal account at the Bank 19 times since January 2003. This was in violation of the Bank's policies and procedures. However, the Bank continued to employ Potthoff even after notice of his personal overdrafts. Potthoff also continued to write cashier's checks to his wife and delay payment on those checks. During one week, Potthoff had issued $12,000 in cashier's checks. Rickey Stuckey and Larry Pitchford met with Potthoff regarding these violations but decided to retain Potthoff as the branch manager.

Potthoff also opened up an account in his wife's name from which he constantly cycled monies even though he was not on the account's signature card. The Bank continued to employ Potthoff after notice of these improprieties.

By the summer of 2003, Bank loan processors continued to note misrepresentations by Potthoff regarding loans, including discrepancies regarding interest rates and collateral. However, the Bank continued to employ Potthoff as a branch manager even after notice of these discrepancies.

In August 2003, Larry Pitchford became aware that Kevin Potthoff, with Bank funds, had paid NSF fees for Harris Leveson at Southland Bank. Pitchford determined that Potthoff's action would be excused since the Bank had charged Leveson a 1% loan fee instead of its usual ½%.

During this time Potthoff continued to solicit Leveson's banking business. While Leveson had a line of credit and checking account at the Bank, he also had a mortgage at MidSouth Bank for approximately $200,000. The term of the mortgage was for 30 years at 6.25% interest. The mortgage was secured by two parcels of land as collateral.

Potthoff represented to Leveson that an investment group from Texas had put up money for the Bank's use, and that Leveson could obtain a loan at the Bank with a 3.99%

interest rate. Potthoff proposed that Leveson take out a new loan with the Bank to pay off his existing mortgage at MidSouth Bank and the $41,000 line of credit at the Bank. Potthoff also proposed a new line of credit for business operating expenses. The collateral for this new loan was to be the same collateral as on the MidSouth Bank mortgage, which was two parcels of land.

Leveson and Potthoff agreed to the terms for two new loans. The interest rate for the $240,000 loan was at a 3.99% fixed rate for 15 years with no balloon and no acceleration clause. The monthly payment would be approximately $1,700 a month. The line of credit would be for $15,000, but it would be increased to $25,000 shortly after the initial closing.

There were problems with scheduling of the loan closing. The closing ran six to eight weeks late. On September 2, 2003, Christine Jernigan and Harris Leveson attended the closing at the Bank which started shortly before lunch. The closing was handled by Potthoff. Christine Jernigan read the loan documents, and Harris Leveson asked Kevin Potthoff numerous questions regarding the documentation.

When a loan is closed, the Bank requires the customer to initial every page and sign the appropriate signature page in the presence of a notary public. Leveson initialed each page of the two mortgages and signed the documents. However, there was no notary public in the room during the time that the documents were executed. The only person present other than Leveson and Jernigan was Kevin Potthoff. The documents that Leveson signed on September 2, 2003, were consistent with the representations made to him by Kevin Potthoff regarding the terms of the loans.

The Court finds that the loan documents which were presented as exhibits at the trial could not have been signed by Harris Leveson on the morning of September 2, 2003. The mortgages and other documents were not even requested by the Eufaula branch until late that morning. The Bank's courier could not have delivered these documents in time for the closing. The Court finds that the loan documents which were initialed and signed by Harris Leveson were not produced by the Bank and were not presented at trial.

Leveson asked Potthoff for a copy of the closing documents. Potthoff told Leveson that he needed to come back after lunch for a copy. The copies were not ready that afternoon as he had promised.

Shortly thereafter, Leveson signed documents to increase his line of credit from $15,000 to $25,000.

Potthoff did not provide Leveson with copies of the loan documents until almost 30 days after the closing. Leveson was never provided with a copy of the settlement statement.

Leveson and Jernigan began to question whether Potthoff was "shooting straight" with them or whether they were getting the run around. Leveson complained to Cara Hutto, a teller at the Bank, and Hutto reported this complaint and approximately ten others to her supervisor. The others that had complained to Hutto about Potthoff were dissatisfied with the amounts of their loan payments and their interest rates.

Lateshia Jackson and her husband also dealt with Kevin Potthoff at the Bank. Potthoff handled their closing. The Jacksons did not get the mortgage Potthoff represented to them that they were getting. There was no notary present to acknowledge their signatures. She and her husband signed documents at the closing but did not receive copies of the documents at that time. When she did get a copy of the documents, it was not what she and her husband had signed.

Beginning September 29, 2003, Leveson and Jernigan started recording their conversations with Potthoff and other bank employees.

Once Leveson finally received copies of the purported loan papers, he noticed that the papers were incorrect. The loan documents which Leveson received from the Bank were not what he had signed at the loan closing in September. None of the pages were initialed. The collateral was four parcels of land instead of two. The interest rate for the large loan was shown to be at 5.5% instead of 3.99%. The monthly payments were $2,098 instead of $1,723. The loan documents specified a balloon payment and contained an acceleration clause.

The documents that Leveson received also indicated that a notary at the Bank, Lisa Bell, signed the acknowledgments as having witnessed Leveson's signatures. However, Bell failed to keep a register book for her notarial acknowledgments, and she did not remember being present at the Leveson closing. She acknowledged that she did not know if Leveson signed the mortgage acknowledgments. She admitted that she could have notarized the documents without witnessing Leveson's execution of the documents.

When confronted by Leveson and Jernigan, Potthoff acknowledged that the documents were incorrect. He claimed that the documents could have been mixed up in the copying process. Potthoff told Leveson that the mortgage would be corrected, that he would have the 3.99% interest rate and that Leveson should pay the agreed-upon payment of about $1,700 per month. Potthoff also assured Leveson that his line of credit was for $25,000 and that the first year's payments on that loan would be interest only.

In October 2003, Potthoff, without authorization, withdrew monies from his wife's law firm's account and deposited them into his account. This was in violation of the Bank's policies and procedures. However, the Bank continued to employ Potthoff as the branch manager even after notice of these withdrawals.

Leveson and Jernigan believed that the line of credit had been increased to $25,000 and requested draws off the line of credit to go into the checking account. Potthoff confirmed that these draws and transfers had been successfully done. Potthoff gave deposit slip receipts to Leveson and Jernigan showing that these draws and transfers had been completed as they requested. Jernigan wrote checks from the account against these deposits.

However, Kevin Potthoff failed to transfer monies from Plaintiffs' line of credit into the checking account. Checks written by Jernigan bounced due to the fact that these draws and transfers were never made. Plaintiffs were caused to incur enormous NSF fees simply because Potthoff failed to transfer funds as promised and as represented.

Potthoff agreed to reimburse Plaintiffs for the NSF fees because Plaintiffs incurred the fees as a result of his mistakes. Branch managers have the authority to agree to reimburse a customer for certain expenses or fees from the Bank's NSF account.

From April 2003 to September 2003, Kevin Potthoff wrote 28 different loans in excess of $5,000,000 on behalf of the Bank. He was the Bank's leading lender for the State of Alabama. At the time of his dismissal, Potthoff's loan portfolio was approximately $25,000,000.

On October 24, 2003, Potthoff presented Leveson with deposit slips of $2,150 and $3,500. The dollar payment represented reimbursement of the NSF fees which Potthoff had promised.

In late October of 2003, Harris Leveson signed a Loan Modification Agreement which modified the interest rate on the large loan to 3.99%. According to Larry Pitchford and unbeknownst to Plaintiffs, the Loan Modification was never presented to the loan committee for approval.

On October 29, 2003, Plaintiffs delivered to the Bank a check for $1,769.89 which represented his first loan payment.

Toward the end of October, Kevin Potthoff went on vacation. While Potthoff was out of the office it came to Pitchford's attention that money had been moved by Potthoff from other customers' accounts into Harris Leveson's account. On Monday, November 3, 2003,

Pitchford confronted Potthoff about the transfers and terminated his employment with the Bank.

Bank employees were instructed not to tell any of the Bank's customers about Potthoff's termination for one week. After one week, they could say that Potthoff was no longer employed at the Bank.

Jerry Gulledge was promoted to branch manager after Potthoff's termination. After Potthoff's termination, Christine Jernigan and Harris Leveson went to see Sharon Giddens, Jerry Gulledge and Larry Pitchford at the Bank regarding the problems with their loans and accounts. Leveson and Jernigan told Giddens, Gulledge and Pitchford that they had not been given the right copies of the loan documentation by Kevin Potthoff. They also told them about the numerous promises and representations made by Kevin Potthoff.

The $1,769.89 check written by Plaintiffs for their first loan payment was not presented by the Bank for payment until November 14, 2003. The Bank noted on its records that the $1,769.89 payment was a "partial" payment.

On November 3, 2003, Leveson delivered another loan payment to the Bank. This was a cashier's check from Southland Bank for $2,426.85. Leveson delivered the payment for that amount because Gulledge had insisted that he do so.

Jerry Gulledge called Harris Leveson and told him that the $2,426.85 check for the second loan payment that was drawn on Southland Bank was no good. Leveson told Gulledge that the money was in his account at Southland Bank and that the check was good. The check eventually cleared.

On November 7, 2003, the Bank unilaterally withdrew monies from Plaintiffs' account without providing any notice to Harris Leveson. Gulledge instructed Sharon Giddens to debit Leveson's account $5,650. The Bank claimed that the deposit had been "made in error" by Kevin Potthoff on October 24, 2003.

The abrupt withdrawal of $5,650 from Plaintiffs' account left them with no money and in overdrawn status. This caused checks to bounce. Plaintiffs had a positive balance in the account when these monies were removed.

On November 12, 2003, Gulledge sent a letter to Harris Leveson claiming that Plaintiffs were late on their loan payments. Gulledge also threatened foreclosure on Leveson's house and property. Plaintiffs were not late on their loan payments.

Gulledge and Pitchford insisted that Leveson abide by what they knew to be clearly deficient loan documents in the Bank's file. Leveson and Jernigan were told that if they could not provide copies of what they claimed Kevin Potthoff promised them or what they claimed they had signed that the Bank wouldn't do anything about it.

According to Larry Pitchford, the Bank showed Plaintiffs' line of credit to be only $15,000 and not $25,000 as represented by Potthoff. Pitchford testified that the Loan Committee had been presented with a request for a $25,000 line of credit request, but that the Committee had approved Leveson for only $15,000. Gulledge told Leveson that until the Bank could find documents showing a $25,000 line of credit, the Bank had to go with the documents that they had which was $15,000.

On December 29, 2003, Gulledge sent Leveson two certified mail letters. One letter advised Leveson that his account had been overdrawn for 49 consecutive days and that the Bank had closed his account. The Bank gave Leveson until Monday, January 5, 2004, to pay $6,784.57 in overdrafts or it would be turned over for collection. This overdraft resulted from the Bank's removal of funds from Plaintiffs' account in November. The second letter advised that his loan was past due and that he had until January 5, 2004, to bring the loan current. The letter also advised that another payment of $4,296.74 was also due on January 5, 2004.

Pitchford and Gulledge advised Leveson that he could pay off the overdraft amount by borrowing additional monies from the Bank. Jerry Gulledge presented to the Bank's Loan Committee a request for a $6,875.57 loan for Harris Leveson to repay NSF and overdraft fees at the Bank. The request noted that the charges and fees were caused "by a previous Eufaula lender." The loan request also noted that "customer still disputes charge." The Loan Committee approved the request but required collateral valued at $330,000. After Leveson refused to go forward with the loan, the Bank wrote off the NSF and overdraft fees. However, the Bank continued to threaten Leveson with economic sanctions even after it had decided to write off the overdraft amount.

In February 2004, Defendants Gulledge and Pitchford threatened Leveson again by telling him that in addition to immediate foreclosure, the Bank had the right to call the entire amount of Leveson's loans.

There is substantial evidence of damage to the Plaintiffs as a result of Defendants' conduct. Leveson was forced to go to various businesses in Eufaula and pick up numerous bounced checks. Potthoff also went to various businesses and picked up bounced checks. The Bank charged $25 per NSF check. The payee's bank charged $30 per NSF check. Kevin Potthoff drafted a letter for Plaintiffs to distribute which explained that "bank error"

caused the checks to bounce. However, businesses did not want the letter. The businesses just wanted their money.

Employees' paychecks bounced, including three to Harris Leveson's secretary, Merri Brogden. Even though Kevin Potthoff apologized to her about the bounced checks, Mrs. Brogden was afraid that Harris Leveson would "go under." When she and the other employees went to the Bank to cash their paychecks, Bank employees would cash them only if Kevin Potthoff were present and gave them his authorization.

Because Plaintiffs' checks were returned for insufficient funds, Plaintiffs' account was picked up by the CheckScan system utilized by a number of Eufaula businesses, including IGA, Piggly Wiggly, Inland Oil, Liberty Oil, Big Cat, Winn-Dixie, Eufaula Country Club and Video Warehouse. Businesses utilizing CheckScan refused to accept Plaintiffs' checks on numerous occasions, causing Harris Leveson to be inconvenienced and greatly embarrassed.

Businesses who received bad checks were concerned about the viability of Plaintiffs' business. People on the street asked Leveson about problems with his business. Between March and October 2003, Plaintiffs had 52 different checks from the Bank which were returned and 235 which were force paid. Most of the 52 bounced checks were presented for payment more than once. The Bank assessed Plaintiffs a $25 charge for each of the 287 checks which were issued with insufficient funds. In addition, for each of the bounced checks, all of the merchants except the Big Cat in Georgetown charged a $30 bounce fee; the Big Cat charged $25 for each of its two bounced checks. These fees alone total at least $9,725.

After the Probate Court received a bad check, the Barbour County Courthouse refused to accept a check from Leveson. Leveson was not allowed to pay with a check at the Courthouse until August of 2005.

Ray Weeks, owner of Big Cat in Georgetown, has known Harris Leveson for a number of years. In 2003, the Big Cat received two bad checks from Leveson. These two bad checks caused him concern about Leveson's business.

Tamara Grubbs Newton's employer, Eufaula Farm Supply, also known as Rainbow Farm Supply, received two bad checks from Plaintiffs in August and September 2003. Mrs. Newton became concerned about Harris Leveson's business, especially since Leveson had never previously given her employer a bad check.

Certified letters concerning bad checks soon poured in from collection agencies. Within ten days of receipt of these letters, Plaintiffs had to pay their indebtedness by cashier's check or money order. Because of these collection letters and because the Bank falsely reported to the credit bureau that Plaintiffs was past due on their loan, Plaintiffs' credit collapsed. VISA declined to issue Plaintiffs a credit card. American Express and GMAC canceled their cards. Plaintiffs' credit score also suffered.

Harris Leveson never agreed that the Bank could have as collateral four parcels of land plus his home. Nonetheless, the Bank recorded with the Barbour County Probate Court two mortgages, each having as collateral four parcels of land and Leveson's home. Plaintiffs later sought a loan from Southland Bank to provide operational money for the business, but were refused because Plaintiffs had no additional collateral.

Plaintiffs felt an additional financial crunch after learning that their line of credit at the Bank was $10,000 less than had been represented by Kevin Potthoff and the documents which Leveson had signed. Plaintiffs were prevented from purchasing needed equipment for their business, including a spray rig and bucket truck. When the line of credit matured, Leveson was forced to borrow the money from his father's estate to pay off the indebtedness.

Merri Brogden worked out of her house as Plaintiffs' secretary. Leveson's financial situation became so stressful that Mrs. Brogden quit her job. As a result, Plaintiffs were forced to rent office space. Plaintiffs have paid $225 per month since October 2003 for rent that they would not have had to otherwise pay if she had not quit. The telephone at this office costs Plaintiffs an additional $110 per month. As of August 2005, Plaintiffs had incurred an additional $7,370 in office expenses that they would not have had to incur had Merri Brogden remained as Harris Leveson's secretary.

Added to the out-of-pocket losses was an enormous loss of time. Christine Jernigan has worked at least 20 to 25 hours each week since December 2002 in an attempt to straighten out the problems caused by the Bank's errors. Harris Leveson agreed to pay Mrs. Jernigan for her services once the Bank problems were resolved. Mrs. Jernigan earns $15 per hour for bookkeeping work.

Harris Leveson has spent approximately 350 hours trying to fix the problems caused by Kevin Potthoff and others at the Bank. Because Leveson often spent up to four hours a day at this endeavor, Harris Pest & Termite Control lost between 150 and 160 termite customers. The value of each of these customers over the five-year contract period ranges from $1,150 to $1,350. The loss of revenue from these lost customers ranges between $172,500 and $216,000.

10/20/05 13:40 FAX 770 849 0400 DPTC COMPANIES 014 013
10/20/2005 08:58 FAX 2052518929 LYB
OCT. 10. 2005 4:52PM FFMBS ATTYS DOTHAN AL NO. P. 15

Spending so much time trying to resolve Bank matters also caused Leveson to lose his work as a cotton scout. For 35 years, Harris Leveson scouted cotton for several local cotton farmers. Prior to the Bank fiasco, Leveson had earned between $55,000 and $65,000 each year at such work. Thus far, Leveson has lost at least $165,000 due to his unavailability to work as a cotton scout.

Defendants' wrongful conduct had a profound effect on Harris Leveson, not only financially but also emotionally. In arriving at an amount for mental anguish, the Court heard direct testimony from not only Harris Leveson but also Christine Jernigan. The Court also observed the demeanor of Harris Leveson during his testimony. The Court observed that he appeared to be a beaten and broken man. He has endured and continues to endure a range of emotions, including devastation, anger, stress, embarrassment and grief, all resulting from the actions of the Defendants. Defendants presented no credible evidence suggesting that the Plaintiffs did not suffer mental anguish and stress from its wrongful conduct.

On July 15, 2005, a few weeks prior to trial, the Bank released the collateral on two of the parcels of land. Larry Pitchford testified at trial that the Bank is ready to extend the fixed rate as represented by Potthoff.

Plaintiffs presented the Court with a chart that noted numerous inconsistencies between Jerry Gulledge's deposition testimony and the taped conversations. Defendants have not disputed those inconsistencies. Jerry Gulledge's deposition testimony is remarkably different from his taped conversations. The Court concludes that Jerry Gulledge missed characterized his statements during his deposition but that he was truthful in his testimony at trial. The Court also concludes that Defendant Larry Pitchford lacked veracity and credibility in much of his testimony.

Jerry Gulledge acknowledged at trial that there was inconsistencies between his deposition testimony and the transcripts of the taped conversations. He admitted at trial telling Leveson that "If you want to play hard ball, we can play hard ball, I can give you until the end of the month to come pay that note off, or we'll foreclose on it." He also admitted telling Leveson that "It's time to dance or go home." Gulledge is now employed at Southland Bank, where he has gained invaluable experience in the banking industry. Gulledge apologized at trial for his threats and the inconsistencies, contending that anything he did or said was at the direction of Bank President Larry Pitchford or Chief Executive Officer Rickey Stuckey.

Gulledge admitted that Peoples Community Bank mishandled Plaintiffs' loans, funds and bank account. He admitted that the Bank negligently and wantonly hired Kevin Potthoff and negligently and wantonly supervised and retained Kevin Potthoff. He admitted that the

T-271 P.16/29 F-311 FROM- OCT-20-05 14:31

Bank had no right to withdraw money from Harris Levason's account. He admitted that there were improprieties with regard to Plaintiffs' loans. He also testified that based on what he now knows, he believes that everything in Plaintiffs' complaint is true.

## Conclusions of Law

In a nonjury trial, the role of the judge is to interpret the law, determine the facts and apply the facts to the law for an eventual decision of the controversy. Ex parte City of Jacksonville, 693 So.2d 465 (Ala. 1996). It is within the province of the trial court when acting as fact finder to weigh conflicting testimony, determine credibility and resolve conflicts in the evidence. *Id.* The Court is free to choose to believe all, part, or none of the evidence presented.

**Negligence and Wantonness**

Plaintiffs claim that all of the Defendants were negligent and wanton (1) in their dealings with Plaintiffs and in their handling and servicing of Plaintiffs loans, funds and bank accounts; (2) in its employee's notarization of Plaintiff Harris Levason's signature without speaking with him or witnessing his signature; (3) in hiring Kevin Potthoff and Jerry Gulledge; and (4) in failing to adequately train, monitor and/or supervise its employees.

Negligence is the failure to use reasonable care to prevent harm to oneself or others. A person's conduct is negligent when he either does something that a reasonably prudent person would not do in a similar situation, or fails to do something that a reasonably prudent person would have done in a similar situation.

Wantonness is the conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty an injury will likely or probably result. Before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he either consciously and intentionally did some wrongful act or consciously omitted some known duty which produced the injury. Machen v. Childersburg Bancorporation, Inc., 761 So.2d 981 (Ala. 1999); Ala. Code, 1975 § 6-11-20(b)(3). When an employee commits wantonness within the line and scope of his employment, his employer is also liable for such wantonness regardless of the employer's lack of actual participation in such wantonness of his employee.

The Court concludes that all of the Defendants were negligent and wanton in their dealings with Plaintiffs and in their handling and servicing of Plaintiffs loans, funds and bank accounts; in the Bank employee's notarization of Plaintiff Harris Leveson's signature without speaking with him or witnessing his signature; in hiring Kevin Potthoff and Jerry Gulledge; and in failing to adequately train, monitor and/or supervise its employees.

(1) **Handling and Servicing of Plaintiffs' Loans, Funds and Bank Accounts**

The Court concludes that all of the Defendants were negligent and wanton in their dealings with Plaintiffs and in their handling and servicing of Plaintiffs' loans, funds and bank accounts. The Court concludes that the evidence in this case more than sufficiently supports this conclusion. Defendant Jerry Gulledge admitted that the Bank mishandled Plaintiffs' loans, funds and bank account. Defendant Jerry Gulledge also admitted that there were improprieties with regard to Plaintiffs' loans.

(2) **Bank Employee Violates Duty as Notary Public**

The Court concludes that the Bank, by and through its employee Lisa Bell acting within the line and scope of her employment, negligently and wantonly violated her duties as a notary public by failing to speak to Plaintiff Harris Leveson and witness his signatures upon two mortgages.

A notary public owes a duty to act honestly, skillfully and with reasonable diligence. First Bank of Childersburg v. Florey, 676 So.2d 324, 331 (Ala. 1996). This duty imposed on a notary public requires the notary to ascertain the identify of the person whose signature he or she attests. Therefore, this duty cannot be fulfilled unless the transaction is done by or before the notary. For these reasons, the duty of the notary public requires that he or she not certify that a person has acknowledged the execution of a mortgage when the person did not acknowledge the execution before the notary. 676 So.2d at 332. If a notary public does not witness the signatures of the mortgagor, is not in the place where the mortgagor signs the mortgage, and does not see or speak to the mortgagor when he signs the mortgage, and the mortgagor does not acknowledge to the notary that he executed the mortgage, the notary's act of signing her name and affixing her notarial seal to the mortgage is a violation of her legal duty. Eason v. Bynon, 781 So.2d 238 (Ala. Civ. App. 2000).

Lisa Bell, while acting within the line and scope of her employment with the Bank, signed her name and affixed her notarial seal to two mortgages obligating Plaintiffs to the Bank. Lisa Bell owed a duty to Plaintiffs to witness the signatures of Harris Leveson upon

said mortgages and to have Harris Leveson acknowledge the execution of the mortgages before her. Bell failed to keep a register book for her notarial acknowledgments as required by law. While Bell testified that she did not remember being present at the Leveson closing, she did admit that she did not know if Leveson signed the mortgage acknowledgments. She also admitted that she could have notarized the documents without witnessing Leveson's execution of the documents. Both Leveson and Jernigan testified that there was no notary in the room during the time that the documents were executed. The Court finds that at the mortgage closing Lisa Bell did not see Harris Leveson, she did not speak to Harris Leveson and she did not witness Harris Leveson's signatures on the mortgages.

Defendants contended that Bell's failure to comply with her notarial duties did not proximately cause the Plaintiffs' damages. The Court concludes otherwise. Plaintiffs presented sufficient evidence that because of the difference in the terms of the mortgages which Leveson actually signed and those which were improperly notarized by Lisa Bell, Plaintiffs were forced to make higher payments at higher interest rates. The discrepancies also caused Harris Leveson to incur enormous mental anguish. The Court concludes that two conflicting sets of loan documents are inexcusable, and that Plaintiffs were damaged as a result.

(3) **Negligent/Wanton Hiring**

Plaintiffs further claimed that the Bank negligently and wantonly hired Kevin Potthoff and Jerry Gulledge. The tort of negligent hiring is separate and distinct from the torts of negligent supervision and negligent retention. Alabama has long recognized a cause of action for negligent hiring. Under Alabama law, an employer may be held liable for injuries to a third party which is the result of the unfitness or incompetence of the employee. Lane v. Central Bank of Alabama, N.A., 425 So.2d 1098 (Ala. 1983); Big B, Inc. v. Cottingham, 634 So.2d 999 (1993), *abrogated on other grounds*, Horton Homes, Inc. v. Brooks, 832 So.2d 44, 57 (Ala. 2001). The employer is negligent in hiring such an employee when the employer knew or should have known of the employee's incompetence or unfitness.

The Bank had been told by Kevin Potthoff's former employer that if Potthoff was going to work in a lending capacity that he would have to be closely supervised. The Bank hired Potthoff as its branch manager then delegated the entire responsibility of lending at that branch to Potthoff while failing to provide any supervision over him. Also Defendant Jerry Gulledge admitted that the Bank negligently and wantonly hired Kevin Potthoff.

There was also sufficient evidence that the Bank negligently and wantonly hired Jerry Gulledge. Gulledge had no previous banking experience. After Potthoff's termination, the Bank put Gulledge in the position of branch manager.

The Bank knew of Potthoff's and Gulledge's incompetence and unfitness yet hired them as branch managers of the Bank. The Court concludes that the Bank negligently and wantonly hired Kevin Potthoff and Jerry Gulledge.

(4) **Negligent/Wanton Supervision and Retention**

Even if this Court had not concluded that Potthoff and Gulledge were negligently and wantonly hired, this Court would nonetheless conclude that the Bank negligently and wantonly supervised and retained Kevin Potthoff and Jerry Gulledge. The facts surrounding Kevin Potthoff's tenure as branch manager conclusively proves that the Bank knew exactly what they were getting when they hired Potthoff. Potthoff's mishandling of his own personal finances clearly indicated that he could not be trusted to handle the finances of others. The Bank was on notice that:

- Potthoff was misrepresenting interest rates and collateral of loans;
- Potthoff was check kiting;
- Potthoff was late in making payments on his personal loan;
- Potthoff was writing cashier's checks to his wife in order to quickly obtain funds;
- Potthoff was issuing loans which had terms different from the terms approved by the Bank's loan committee;
- Potthoff wrote an unsecured loan allegedly for his housekeeper;
- Potthoff opened up an account in his wife's name from which he constantly cycled monies even though he was not on the account's signature card;
- Potthoff had been constantly overdrawn on his personal account at the Bank; and,
- Potthoff, without authorization, withdrew monies from his wife's law firm's account and deposited them into his account.

The Bank's President Larry Pitchford and the Bank's Chief Executive Officer Rickey Stuckey had actual notice of these improprieties, yet the Bank continued to employ Kevin Potthoff. The Court concludes that the Bank knowingly placed Kevin Potthoff in a position to injure the Plaintiffs. The Bank chose to ignore the questionable activities of Kevin Potthoff because Potthoff was what the Bank wanted – a moneymaking loan officer. In just six months during 2003, Kevin Potthoff wrote more than $5 million in loans, greatly exceeding other Alabama lenders. The Bank simply did not want to lose its leading lender. Finally, Jerry Gulledge admitted that the Bank and Larry Pitchford negligently and wantonly supervised and retained Kevin Potthoff.

**Fraud/Suppression**

Plaintiffs Harris Leveson and Harris Pest & Termite Control say that they were harmed by false statements intentionally, mistakenly and/or recklessly made by Defendants. Plaintiffs say the false statements were: (1) that Defendants would finance two loans at certain rates, terms and conditions; (2) that the collateral for these loans would be two parcels of property; (3) that the loan in the amount of $15,559.50 would be increased to $25,000; and, (4) that Defendants would reasonably, properly and in good faith handle, maintain, oversee and/or otherwise account for Plaintiffs' loans, funds and bank account. Plaintiffs also say that they were harmed because Defendants hid or withheld important facts from them. Plaintiffs also say that Defendants suppressed material facts concerning their loans, funds and bank accounts.

A false statement may be spoken, written or other conduct. To recover damages on this claim, Plaintiffs must establish: (1) that Defendants intentionally, mistakenly and/or recklessly stated to Plaintiffs that a present or past important fact was true; (2) that Defendants' statements were false; (3) that Defendants knew that the statements were false when they made them and Plaintiffs did not know such statements were false; (4) that Defendants intended that Plaintiffs rely on those statements; (5) that Plaintiffs relied on the statements; and (6) that Plaintiffs acted and were harmed. Osborn v. Custom Truck Sales & Service, Div. of Alley-Cassetty Coal, Inc., 562 So.2d 243 (Ala. 1990). To prove their suppression claim, Plaintiffs must show that Defendants hid or withheld an important fact from Plaintiffs; that Plaintiffs did not know of the important fact; that Plaintiffs acted and was harmed. Hall Motor Co. v. Furman, 285 Ala. 499, 234 So.2d 37 (1970).

Kevin Potthoff consistently represented to Plaintiffs that the Bank would finance a $240,000 loan with a 3.99% fixed rate for 15 years with no balloon and no acceleration clause, that the monthly payment would be approximately $1,700 a month and that the collateral would be two parcels of property. These representations were false. The collateral was four parcels of land instead of two. The interest rate for the large loan was 5.5% instead

of 3.99%. The monthly payments were $2,098 instead of $1,723. The loan documents specified a balloon payment and contained an acceleration clause. Plaintiffs relied on those representations to their detriment and they were damaged as a result of the false statements.

Having established that Defendants are guilty of fraud, then the Plaintiffs are entitled to recover for such actual damages that they suffered. In addition to actual damages, punitive damages are available in a fraud action where the plaintiff proves by clear and convincing evidence that the wrongdoer's conduct is malicious, oppressive, or gross, and that the misrepresentation that is the basis of the fraud is made with the knowledge of falsity and with the purpose of injuring the party. Ala. Code, 1975 § 6-11-20.

Because the Court has concluded that Plaintiffs have prevailed on their first two fraud claims, it is unnecessary for the Court to reach plaintiffs' remaining two fraud claims and their suppression claims.

•**Breach of Contract**

Plaintiffs contend that the Bank breached contracts and/or agreements with them. A contract is breached or broken when a party does not do what it promised to do in the contract. To recover damages from Defendant for breach of contract, Plaintiffs must prove: (1) that Plaintiffs and Defendant entered into a contract; (2) that Plaintiffs did all of the things that the contract required them to do; (3) that Defendant failed to do the things that the contract required it to do; and (4) that Plaintiffs were harmed by that failure. Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1303 (Ala. 1991). Plaintiffs are entitled to that sum which would place them in the same condition they would have occupied if the contract had not been breached. Boyette v. Oakes, 518 So.2d 37 (Ala. 1987).

Mental anguish damages may be awarded in certain cases for breach of contract, provided that "the subject matter of the contract is so closely associated with matters of mental concern, or with the emotions of the party to whom the duty is owed, that a breach of that duty can reasonably be expected to result in mental anguish or suffering." B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala. 1979)

The Court concludes that the Bank quite clearly breached the contracts and agreements with Plaintiffs.

Plaintiffs entered into an agreement with the Bank when they opened their account. This legal contract between Plaintiffs and the Bank sets forth what Plaintiffs and the Bank both can and must do regarding deposits and withdrawals from the account. The Bank had

a duty to properly handle its depositors' account transactions. Reynolds v. McEwan, 416 So.2d 702 (Ala. 1982). Where, as in this case, a depositor issues checks on his or her bank and those checks are properly presented for payment, yet are wrongfully refused or dishonored by the bank, a depositor may then maintain a cause of action for breach of contract and other duties arising out of the bank's wrongful dishonor. First Alabama Bank of South Baldwin v. Prudential Life Insurance Co. of America, 619 So.2d 1318 (Ala. 1993); First National Bank v. Ducros, 27 Ala. App. 193, 168 So. 704 (1936). Plaintiffs, as customers and depositors of Defendant Bank, gave express instructions to the Bank regarding deposits and were given receipts evidencing those deposits. Numerous checks were issued in reliance that those deposits had been made. Yet the Bank wrongfully refused to properly honor those checks, causing Plaintiffs to incur various costs and fees due to insufficient funds in Plaintiffs' account, as well as causing Plaintiff Harris Leveson extreme embarrassment and humiliation. The Bank also removed funds from Plaintiffs' account without authorization.

Plaintiffs also entered into a Loan Modification Agreement with the Bank. The Bank also breached that agreement with Plaintiffs.

Ordinarily punitive damages are not recoverable for breach of contract. Gordon v. Universal Door Systems, Inc., 596 So.2d 565, 572 (Ala. 1991). However, punitive damages have been allowed where fraud or duress was coupled with breach of a contract. *See* Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909 (Ala. 1994); Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).

**•Breach of Fiduciary Duties**

Plaintiffs also claim that the Defendants breached fiduciary duties owed to the Plaintiffs. A fiduciary obligation exists whenever one person--the client--places special trust and confidence in another person--the fiduciary--relying upon the fiduciary to exercise discretion or expertise in acting for the client. The fiduciary knowingly accepts that trust and confidence and thereafter undertakes to act in behalf of the client by exercising the fiduciary's own discretion and expertise. The Court recognizes that the mere fact that a business relationship comes into being between two persons does not mean that either owes a fiduciary obligation to the other. If one person engages or employs another and thereafter directs or supervises or approves the other's actions, the person so employed is not a fiduciary. It is only when one party reposes, and the other accepts, a special trust and confidence, usually involving the exercise of professional expertise and discretion that a fiduciary relationship comes into being.

When one person does undertake to act for another in a fiduciary relationship, the law forbids the fiduciary from acting in any manner adverse or contrary to the interests of the client, or from acting for the fiduciary's own benefit in relation to the subject matter of their relationship. The client is entitled to the best efforts of the fiduciary on the client's behalf, and the fiduciary must exercise skill, care and diligence when acting on behalf of the client. A person acting in a fiduciary capacity is required to make truthful and complete disclosures to those to whom a fiduciary obligation is owed, and the fiduciary is forbidden to obtain an unreasonable advantage at the client's expense. Army Aviation Center Federal Credit Union v. Johnson, 716 So.2d 1250 (Ala. Civ. App. 1998); AmSouth Bank v. Spigener, 505 So.2d 1030 (Ala. 1986).

Kevin Potthoff inspired the confidence of Leveson that he would act in good faith for Leveson's interest. Harris Leveson imposed a great deal of trust in Potthoff and followed his financial recommendations regarding his loans and accounts. Unquestionably, Kevin Potthoff was in a position to exercise dominion over Plaintiffs' account, and the dominion that he exercised ultimately damaged the Plaintiffs. Under these facts, Kevin Potthoff and his employer owed fiduciary obligations to Plaintiffs which they breached. The Bank expressly assumed certain duties to Plaintiffs that the Bank breached. In breaching these fiduciary duties, the Bank acted knowingly, deliberately and/or recklessly and placed its own profit, objectives and success ahead of and to the detriment of the profit, success and objectives of Plaintiffs.

The Bank and the Plaintiffs had a fiduciary relationship which resulted in the attendant duty of the Bank to exercise utmost care, candor, loyalty and good faith in its dealings with Plaintiffs. Based upon the evidence presented in this case, the Court finds that the Bank breached that duty in this case.

**Conversion**

The Court also concludes that the Bank converted monies from Plaintiffs' account. To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse. Ott v. Fox, 362 So.2d 836 (Ala. 1978). Damages for conversion are measured by the value of the property as of the date of the conversion plus interest at the rate of 6% per annum from the date of the conversion. Charter Hospital of Mobile, Inc. v. Weinberg, 558 So.2d 909, 912 (Ala. 1990). Punitive damages are recoverable for conversion when such conversion was willful or was committed under circumstances of insult or malice. Lyons v. Williams, 567 So.2d 1280 (Ala. 1990). It is sufficient if the proof shows that the conversion was attended by rudeness, wantonness, recklessness or insulting manner or accompanied by circumstances

of fraud, oppression, aggravation or gross negligence. Empire Gas, Inc. v. Cartwright, 595 So.2d 1348 (Ala. 1992).

The Bank converted to its own use certain funds to which Plaintiffs were entitled. Kevin Potthoff caused Plaintiffs to incur substantial NSF fees as a result of his mishandlings of their account. He also had been instructed by Plaintiffs to transfer funds into the account from their line of credit. Pursuant to his authority as branch manager and the instructions he received from Plaintiffs, Potthoff deposited $5,650 into Plaintiffs' account on October 24, 2003. Potthoff provided Plaintiffs with receipts of these deposits. The Bank abruptly withdrew these monies from Plaintiffs' account on November 7, 2003. Jerry Gulledge admitted that the Bank had no right to withdraw money from Harris Leveson's account. This withdrawal without notice to Plaintiffs caused them considerable harm. At the time of this wrongful taking, these funds belonged to the Plaintiffs and were clearly identifiable. Citizens Bank of Moulton v. Jones, 671 So.2d 737 (Ala. Civ. App. 1995). This Court concludes that the $5,650 which Kevin Potthoff deposited into Plaintiffs' account was rightfully owed to the Plaintiffs and should not have been withdrawn by the Bank. There were other appropriate avenues available to the Bank to deal with Potthoff's interference with other customers' accounts. Taking the Plaintiffs' money was not one of them.

**-Outrage**

Plaintiffs also claimed that the actions of the Defendants were extreme and outrageous and were done intentionally or recklessly causing severe emotional distress to Plaintiffs. In order to make out a case of outrageous conduct, Plaintiffs are required to show extreme and outrageous conduct that is intentional or reckless and causes severe emotional distress or bodily harm. Goodwin v. Barry Miller Chevrolet, Inc., 543 So. 2d 1171, 1174 (Ala. 1989). The tort consists of four basic elements: (1) that the Defendant knew or should have known that its conduct was likely to result in emotional outrage; (2) that the conduct was extreme and outrageous; (3) that the Defendant's actions were the cause of the Plaintiff's distress; and (4) that the emotional distress suffered by the Plaintiff was "severe." U.S.A. Oil, Inc. v. Smith, 415 So. 2d 1098, 1100 (Ala. Civ. App.), cert. denied sub nom. Ex parte Smith, 415 So. 2d 1102 (1982). The Defendant's conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in civilized society." American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1981).

While it has been recognized that a Plaintiff's burden of proving outrage is a heavy one, it has also recognized that this burden is not impossible to meet. Surrency v. Harbison, 489 So. 2d 1097, 1105 (Ala. 1986). In order to establish outrageous conduct by a corporate

Defendant, it must be shown that the conduct "was perpetrated as a means to further the Defendant corporation's business," or that a jury could conclude that "this is the way the company does business." Busby v. Truswal Systems Corp., 551 So. 2d 322, 327 (Ala. 1989).

The Court concludes that this case is the epitome of the claim of outrage. The evidence presents a power using its force to coldly abuse one of less significance with absolute knowledge of the consequences. Harris Leveson was absolutely helpless when he attempted to straighten out the mess which had been caused by Kevin Potthoff. Instead of being treated apologetically or respectfully, Leveson was met with absolute cruelty. He was sent two foreclosure notices even though he was not even late on his loan payments. The Bank abruptly removed $5,650 from his business account without notice, knowing that overdrafts would occur, and then threatened him regarding the resulting overdrafts. And at the time that the State President and branch manager summoned Harris Leveson to tell him that they expected Leveson to pay off the overdrafts, that the Bank could call all his loans and foreclose on all four parcels of property - including his home - the Bank had already written off the overdrafts. The Defendants had every intention of pressuring Harris Leveson into silently paying the Bank more money.

**Compensatory Damages**

The Court, having found in favor of the Plaintiffs on the above claims, assesses Plaintiffs' compensatory damages at Two Million Five Hundred Thousand Dollars ($2,500,000).

The actual damages includes $9,725 for insufficient fund and overdraft fees, $9,552 in overpayments on loans, $7,370 for additional office expenses, $5,650 representing the amount converted from Plaintiffs' account, $216,000 representing lost customers, $165,000 representing the lost value of work as a cotton scout, $42,000 representing Jernigan's time working on the bank errors and $211,000 representing the payoff of the void mortgage.

In addition the Plaintiff had 52 different checks returned after being presented for payment. Many of these checks were presented for payment more than once. Each returned check compounded the damage to the Plaintiff.

The Court recognizes that the Bank released two of the parcels shortly before trial and offered at trial to correct Plaintiffs' interest rate on the mortgage to 3.99% as promised by Potthoff. The Court has taken these facts into consideration in arriving at its award.

**Punitive Damages**

A principal can be held responsible for an act of his agent, which was committed beyond the scope of the agent's authority by subsequently ratifying such act. Ratification by the principal of an act of his agent requires an intent on the part of the principal to ratify such act. This intention may be express or implied, and may be inferred where there is evidence intending to show that the principal, with adequate knowledge of the facts and circumstances, so conducted himself as to indicate his purpose to confirm or adopt the unauthorized act of his agent. The Court concludes based on the evidence presented that the Bank authorized and ratified the conduct of its employees, including Kevin Potthoff, Larry Pitchford, Jerry Gulledge and Lisa Bell.

In order for the Plaintiffs to recover punitive damages they must prove by clear and convincing evidence that the Bank consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to the Plaintiffs. AutoZone, Inc. v. Leonard, 812 So.2d 1179 (Ala. 2001). Oppression is the subjecting of a person to cruel and unjust hardship in conscious disregard of that person's rights. ConAgra, Inc. v. Turner, 776 So.2d 792 (Ala. 2000).

The record in this case is replete with substantial evidence which is clear and convincing to the Court sitting as the trier of facts in this matter that the following took place:

- Instead of acknowledging that its loan documents demonstrated fraud and insufficient acknowledgments, the Bank menacingly sought to foreclose;
- Instead of giving their customer the benefit of the doubt regarding his dealings with a manager whom the Bank knew to be dishonest, the Bank insisted that Leveson provide them with "written proof" of his claims;
- There was testimony that certain bank documents should have existed but none could be found and no credible explanation was given for their absence;
- Instead of simply putting Leveson's loans and account in the state in which they should have been, the Bank put Harris Leveson on the verge of financial ruin;
- Defendants utilized pressure, leverage, threats and other coercive measures to force payment of loans; and,
- Defendants Pitchford and Gulledge lacked veracity and credibility in much of their testimony.

The Court concludes that the evidence in this case more than sufficiently supports the inference that the Defendants' conduct warrant the imposition of punitive damages. The Court, having found in favor of the Plaintiffs on the above claims, assesses the Plaintiffs' punitive damages at One Million Dollars ($1,000,000).

## Conclusion

Based on the foregoing Findings of Fact and Conclusions of Law, it is **ORDERED, ADJUDGED** and **DECREED** as follows:

1. The Court accordingly directs that final judgment be entered in favor of the Plaintiffs, Harris Leveson and Harris Pest & Termite Control, and against Defendants, Peoples Community Bank, Larry Pitchford and Jerry Gulledge, jointly and severally in accordance with the Court's verdict as follows: Compensatory damages in the amount of $2,500,000 and punitive damages in the amount of $1,000,000.

2. Costs are taxed to the Defendants.

DONE and ORDERED this the 7th day of October, 2005.

CIRCUIT JUDGE

cc: Ted Taylor, Esq.
Leah O. Taylor, Esq.
James L. Martin, Esq.